Comstock v. Willoughby.

his judgment, which was against both of the tenants in common, nor Story under the Sadler judgment, which was also against both, acquired the interest of Curran in the property. But by proceeding another step we shall find that Story acquired it under the judgment of the Herkimer County Bank against Curran (No. 8), which was a lien upon the undivided share of Curran in the property which had been sold, and upon nothing more. That is the precise case provided for by the 54th section. Story paid more than was necessary to secure his object, but that could do no harm.

The result is, that the sheriff must execute a deed to Beekman and others for the undivided share of Leonard in the property, and to Story for the share of Curran.

Ordered accordingly

---

COMSTOCK, President of the Mechanics' Banking Association
*vs.* WILLOUGHBY.

An association formed under the general banking act of 1838, (*a*) may, after having gone into operation, for the purpose of transfering the same to the comptroller as security for circulating notes, lawfully acquire title to state stocks and bonds and mortgages. (*b*)
Such an association has the right to increase its capital and the number of its associate members from time to time as is thought proper.
If the question arises whether a certain transaction is a loan or a sale, and if the former whether usurious, it should be submitted to the jury. (*c*)

ERROR to the Superior court of the city of New York. Comstock, president of the Mechanics' Banking Association, an association formed under the general banking law of 1838, as is alleged, brought an action of debt in the superior court of the city of New York against Willoughby. The action was commenced in May, 1840, and the plaintiff declared on a bond given by the defendant to plaintiff, president of

---

(*a*) It was at one time considered doubtful whether the general banking act of 1838 was not unconstitutional under article 7, § 9, of the constitution, which requires a two-third vote to create a body corporate, associations formed under that act being considered corporations ; and in *De Bow* v. *The People,* 1 Den. 9, the supreme court held the act unconstitutional, it not having been passed by a two-third vote. It has been decided that such associations are

Comstock v. Willoughby.

the Mechanics' Banking Association, in the penal sum of one hundred and twenty thousand dollars, bearing date the second day of November, 1838.

The condition of said bond was that the defendant should

corporations generally; *Talmage* v. *Pell*, 9 Paige, 410; *Willoughby* v. *Comstock*, 3 Hill, 389; that they are corporations for taxation purposes; *The People* v. *Assessors of Watertown*, 1 Hill, 616; *The People* v. *Supervisors of Niagara*, 4 Hill; *S. C.*, 7 *id.*, 504; that they may be sued as corporations by summons; *Case* v. *The Mechanics' Banking Association*, 1 Sandf., 693; that such associations are moneyed corporations, and subject to all the provisions of 1 R. S., 589, regarding moneyed corporations; *Leavitt* v. *Tyler*, 1 Sandf. Ch., 207; *Boisgerard* v. *New York Banking Company*, 2 *id.*, 23; *Sagory* v. *Dubois*, 3 *id.*, 466; *Gillet* v. *Dubois*, 3 Comst., 479; and that they are bound and affected by the statutes relating to moneyed corporations—excepting only so far as such statutes are inconsistent with the provisions of the act to authorize the business of banking, or of the acts amending the same; *Talmage* v. *Pell*, 3 Seld., 347, 8. But it is now well settled that banking associations, formed under the general banking act of '38, are not bodies corporate *within the meaning of the constitution*, and that that act is constitutional, though not passed by a two-third vote. *Warner* v. *Beers*, 23 Wend., 103; *Gifford* v. *Livingston*, 2 Den., 380, overruling *De Bow* v. *The People*, 1 *id.*, 9; *Palmer* v. *Lawrence*, 1 Seld., 389; *Talmage* v. *Pell*.

(*b*) Associations formed under the act of '38 are banking corporations, and possess only authority to carry on the business of banking in the manner and with the powers specified in the said act. They have no power to purchase state or other stocks for the purpose of selling them for profit, or as a means of raising money, except when such stocks have been received in good faith, as security for a loan made by, or a debt due to such association, or when taken in payment in whole or in part of such loan or debt. Second resolution of the court of appeals in *Talmage* v. *Pell*, 3 Seld., 348. And where such a banking association purchased stocks of the state of Ohio, with the intent (which intent was known to the vendor) of trafficking in them, and transfered mortgages held by it as collateral security for the price of the stocks, *held*, that the transaction was illegal, and that, the association having become insolvent, the receiver could repudiate the purchase and reclaim the mortgage. *Talmage* v. *Pell*. Such a banking association can not purchase state stocks on the credit of the bank, for the purpose of either pledging or selling them to redeem the outstanding circulating notes, and the president, who conducted the negotiation, is charged with knowledge of its illegality and can not, by advancing to the seller the price agreed to be paid, enforce the payment against the association. *Bank Commissioners* v. *St. Lawrence Bank*, 3 Seld., 513. This case appears distinguishable from the principal case (*Comstock* v. *Willoughby, President, &c.*), inasmuch as the stocks were purchased to redeem outstanding notes, and not, as in the latter, as a security for a new issue.

(*c*) *Ketchum* v. *Barber*, 4 Hill, 228, per NELSON, Ch. J.; *Smith* v. *Lynes*, 3 Seld. 41; *Bartlett* v. *Williams*, 1 Pick., 288; *Stevens* v. *Davis*, 3 Metc., 211; *Catlin* v. *Gunter*, 1 Kern., 368.

pay or cause to be paid to the plaintiff, president as aforesaid, or his successors or assigns, sixty thousand dollars on or before the second day of November, 1848, with interest at six per cent per annum, payable half yearly, on the first days of May and November in each and every year, unless the said principal sum should be sooner demanded by the comptroller of the state to enable him to fulfill the duties imposed on him by the general banking act of 18th April, 1838; the said defendant was also by said condition bound to pay the said principal sum, if sooner demanded, one half part on a previous notice of six months, and the residue after a previous notice of one year.

The defendant pleaded *non est factum*, and gave notice that said bond was void for usury; that it is also void because the association in making the loan purporting to be secured by said bond, violated the statute by dealing in the purchase and exchange of stocks; that all the transactions of said association since the attempt to create the same are violations of the statute, whereby said bond is without consideration; the said association is dissolved, does not exist, and never has existed, &c.

The cause was tried on the first Monday of June, 1842, and a verdict found for the plaintiff, on which judgment was rendered in October, 1842, in his favor.

On the trial certain exceptions were taken by the defendant. It appeared in testimony that about September, 1838, the defendant applied to Messrs. Parker & Co. of New York, to purchase of them fifty thousand dollars of the stock of the state of Maine redeemable in 1848, bearing an interest of five per cent, and which he offered to buy at par, payable in a mortgage on property in Brooklyn. He was told by Parker & Co. that the Mechanics' Banking Association would probably take his mortgage, and that if he could make an arrangement with that association, Parker & Co. would take the stock of that association in exchange for Maine stock; the defendant afterwards told Parker & Co. he had made the arrangement with said association to give a mortgage and receive their stock provided the arrangement to exchange such stock for the Maine stock could be carried out, and the

Comstock v. Willoughby.

association also told Parker & Co. the same, whereupon in order to carry out said arrangement the said association and Parker & Co., on the 29th of September, 1838, made an agreement in writing by which said association, in terms, agreed to purchase of Parker & Co. fifty thousand dollars of the stock of the state of Maine, payable in stock of the association, each at par, it being understood that the association was not bound to receive the stock unless the defendant furnished them with mortgages to the same amount, as agreed by him on the same day. This agreement was based upon the original arrangement between Parker & Co. and the defendant, and was intended to give effect to that arrangement. The defendant told Parker & Co. he wanted this Maine stock to deposit with the comptroller (as he was about establishing a bank) as security for bills to be issued. Two days before the above agreement was put in writing, between Parker & Co. and said association, the defendant proposed in writing to said association, to give them a mortgage for fifty thousand dollars, with interest at six per cent, for fifty thousand dollars of Maine five per cent stock, and on the day of making the aforesaid agreement between Parker & Co. and said association, the defendant and said association agreed as follows, that is, the association were to transfer fifty thousand dollars of the said Maine stock to the defendant, if Parker & Co. delivered the same to the association, upon the defendant's giving a bond and mortgage for the same sum, &c. In consequence of this arrangement with the defendant, the association and Parker & Co. made the agreement of the same date which has already been mentioned. The tripartite arrangement thus entered into between the association, the defendant and Parker & Co. was subsequently carried into execution; Parker & Co. delivered to the association the Maine stock and received fifty thousand dollars of the stock of the association; the association on the same day delivered the Maine stock to the defendant and received his bond and mortgage. The bond and mortgage are for sixty thousand dollars, being for the said fifty thousand dollars of Maine stock, and ten thousand dollars of the stock of the said association subscribed for and received by the

defendant. When Parker & Co. received the fifty thousand dollars of stock they subscribed the articles of association and became associates, and the defendant did the same as to his ten thousand dollars of stock. The bank had then been in operation about a month. On 6th March, 1839, defendant transfered his stock in the association, by way of hypothecation, under which it was finally sold in September, 1840.

A book of the association, called a "book of mortgages," was produced by the defendant, in which were entries which mention that the defendant applied in October, 1838, to the association for a "loan" of ten thousand dollars of their stock; and which entries also refer to the application for the fifty thousand dollars as an application for a "loan," and that the committee of the association agreed to the same. These were proved to be the memoranda made by the committee on the subject. Testimony was given to show that the Maine stock was not worth par, and also as to the value of the stock of the association, to show that it was below par.

The counsel for the defendant raised the following points and requested the judge to charge accordingly: First. The association formed under the general banking law having no other powers but those strictly granted to them by that law, they have no power to change their stock for the stock of any other company or state; nor have they any power to deal in the purchase and sale of stocks of corporations or states. Second. All such transactions when entered into by such associations are void and all securities taken in such cases are also void and can not be enforced in law. Third. The transaction between the association and Parker & Co., purporting to exchange the stock of the association for the stock of the state of Maine, was absolutely void, and the association acquired no title whatever to the stock of the state of Maine attempted to be transfered to them. Fourth. It was also void, being repugnant to the policy of the general banking law, and a fraud upon it, in the essential particular of the capital of the company. Fifth. The association having no title to the stock forming the principal

consideration of the bond, the entire bond is void. Sixth. Granting for the argument's sake, that the association had acquired a title to the Maine stock on the maxim " potior conditio possidentis," or for any reason that may be assigned, they had no power to sell it to the defendant, and every security taken on such sale would be void. Seventh. They had power to use it as part of their assets for the purpose of a loan, and it must be considered as a loan if the court is bound to give the transaction such favorable interpretation as may sustain it. Eighth. Whether the transaction between the defendant and plaintiff assumed the appearance of a sale or a loan, it is under all the circumstances thereof to be considered in law a loan. And in this view it was a loan of the funds of the plaintiff to the defendant in the form of the five per cent stock of the state of Maine upon the security of defendant's bond and mortgage. 1. It must be so considered because in no other way could the plaintiff legally act in the premises. 2. It so appeared from the plaintiff's book. Ninth. The five per cent stock of the state of Maine was a depreciated stock, having been purchased by the company at 95 per cent a short time prior to the transaction, and, no change in its value having taken place down to the time of the loan, this was its market value. Tenth. The association had power to terminate the loan at any time by giving six months' notice as to one half, and twelve months' notice as to the remainder. If by enforcing this right the association could at any period of the ten years secure usurious interest, the contract must be considered as made with this view and is usurious and void. Eleventh. Upon every rule of calculation it is usurious and void. Twelfth. The whole transaction is a fraud on the general banking law, and in violation of its policy and void. Thirteenth. The stock of the Mechanics' Banking Association was also a depreciated stock, it was at no time worth par, and this adds strength to all the preceding conclusions.

The plaintiff's counsel insisted that, First. The transaction of September 29, and November 2, 1838, by which the plaintiff's bank acquired the bond and mortgage in controversy, was, as to them, issuing their stock at par upon the

faith of that bond and mortgage.  There was no loan of money nor any proposition or dealing for a loan before the transaction, nor any circumstances evidencing a covert loan before or after the date of the bond; consequently it was not u~urious.  Second. If the contract between the defendant, Parker, and the bank for the defendant's acquiring the Maine stock be considered as having been had directly with the plaintiff's bank, there is no usury in that.  It was merely a sale and purchase of stock to the defendant who wanted stock, not to raise money on, but to hold.  It was not openly or covertly a loan of money; consequently the transaction was not usurious.  Third. Independently of the preceding propositions, there was no evidence showing that the stocks taken by the defendant on the giving of the bond and mortgage were taken above their actual value so as to render the transaction less favorable than a loan at seven per cent per annum interest.  Fourth. And even if the market value to others of the Maine stock or bank stock had been so far below par as to be less advantageous to others than a seven per cent loan, still the stock was worth to the defendant and realized to him at the time full par value.

The judge charged the jury as follows: That the banking association under the act entitled " An act to authorize the business of banking," passed April 18, 1838, had the power and right by law to procure such stocks and bonds and mortgages as might lawfully be deposited with .the comptroller as the basis of circulating notes to be issued to and by them, and the procuring of such stocks or bonds and mortgages for such purpose was lawful and not against the policy or letter of the statute; and that if the transaction by which the stock in question was procured by the association was either for the purpose of depositing with the comptroller or of immediately procuring the bond and mortgage of the defendant for the purpose of their being so deposited, then the bond in suit was not invalid unless it was usurious. That if the transaction upon which the bond of the defendant was given was for an issue of stock of the plaintiff's association at par, or for the stock of the state of Maine, actually purchased by the defendant either from Parker &

Co. or the plaintiffs, and was not covertly a loan but really a purchase of the stock, and was not a design or shift to evade the appearance of its being a loan when it was really and in fact a loan, then the bond was not usurious or invalid on that account. And if upon both these points the jury should be of opinion for the plaintiff, then they should render a verdict for the plaintiff, otherwise for the defendant. To which the counsel for the defendant excepted.

The jury found for the plaintiff one hundred and twenty thousand dollars damages, and a motion for a new trial having been overruled, the case came before this court on a writ of error.

*J. Anthon,* for plaintiff in error.

1. At the time of the transactions detailed in this case, the Mechanics' Banking Association, of which the plaintiff was president, had been duly organized under the general banking act, and was in full operation under the same, and the said transactions were carried on with said association in such its character.

2. Such associations have no other powers but those strictly granted to them by the statute, which gives them no power to create any new stock after they are organized, nor to exchange their stock, new or original, for the stock of any other company or state, and the court below erred in ruling they had such power.

3. Such associations have no power to traffic in stocks, or bonds and mortgages of any kind, in any way, by purchase and sale or barter, and the court below erred in ruling that they had such power.

4. The court below erred in ruling that such banking association had a right and power to purchase stock and bonds and mortgages, provided they did so for the purpose of deposit with the comptroller, as the basis of circulating notes to be issued, the said statute confering no such power.

5. All such transactions beyond the legal powers of such associations are void, and all securities taken in such cases are also void, and can not be enforced in law.

6. The transaction between the Mechanics' Banking Association and Parker & Co., purporting to exchange the new issues of the association for the stock of the state of Maine, was absolutely void, and the association acquired no title whatever to the said stock so attempted to be transfered to them, and the court below erred in ruling otherwise.

7. The transaction is equally void, whether viewed as a simple barter, as stated in the last point, or as a circuitous mode of acquiring a title to Willoughby's bond and mortgage, and the court erred in ruling otherwise.

8. The court below erred in ruling that the transaction by which the association procured the Maine stock was legalized, provided the same was immediately applied to procuring therewith the bond and mortgage of Mr. Willoughby, for the purpose of deposit with the comptroller, the statute recognizing no such power or right.

9. The whole transaction was repugnant to the general policy of the banking act and a fraud upon it, and is in all its parts void, and all securities growing out of it are also void.

10. The consideration for the bond, on which the present suit is brought, for the reasons stated in the preceding points, entirely failed, and the bond is void.

11. The delivery of the stock of the Mechanics' Banking Association and of the state of Maine to Willoughby, upon his executing to the defendant in error a bond and mortgage, taken in connection with the documentary evidence in the case, was clearly a loan, and it was the duty of the court below to have so declared it to the jury.

12. The court below erred in leaving it as a matter for the jury to decide whether it was a sale or a loan.

13. The question of usury was improperly put to the jury by the court below; the jury ought to have been directed that the transaction being in law a loan, it was usurious if they should find from the depreciated character of the stock and from the other facts in the case, that more than 7 per cent had been received.

It is well settled, and I presume need not be here discussed, that the free banks, as they are commonly called, creat-

ed under the general banking act, are strictly confined to the powers granted them by that statute. And that as a necessary consequence all acts done by them, and all securities taken in the exercise of power not granted to them by the said act, are entirely void.

Now, in order to apply this rule of law to the case under consideration, it becomes necessary to examine for a moment the structure of these associations.

The general banking act is not remarkable for legal skill in its general construction. The first 14 sections are occupied with provisions regulating the action of associations which are not created until we read the 15th section, and there it is provided very clearly that the entire machinery shall be arranged before the free bank can have existence.

1. There must be a precise, ascertained capital stock actually existing and in the hands of the associates, and in that sense a capital paid in.
2. It must be divided into shares.
3. These shares must be held by *named* shareholders, and the number of shares held by each must be ascertained and fixed.
4. There must be a designated place of doing business.
5. A name.
6. A period of existence.

All these matters, *as things ascertained, determined* and fixed, must be so specified in a certificate signed and sealed by the said shareholders, and filed with the county clerk.

Now, in the case of the Mechanics' Banking Association all these things had been done, at the time of the tripartite transaction between Parker & Co., Willoughby and the association.

The Mechanics' Banking Association at that time sought to avail itself of a privilege contained in said act of converting a portion of its capital into a circulating medium for the purpose of banking, which could only be effected by transfering to the comptroller a portion of the public debts of the United States, or of some particular state, or by a like transfer of bonds and mortgages.

The act is entirely silent with regard to the mode or man-

ner by which these associations may acquire such public debts, state debts, or mortgages. It does, however, provide (§ 19) that the original stock in the hands of the associates may be sold and transfered, and the purchaser thereby become a shareholder and succeed to all the rights and liabilities of prior stockholders, and perhaps it may have been reasonably infered that such original shares may be made the medium of purchase of such public debts, state debts, or mortgages, as a basis for such contemplated issues. But conceding this, which I will hereafter contest, can it be seriously insisted that such associations have the power to create *new stock* to an unlimited extent beyond the capital for this purpose? And yet such is the course pursued in this instance, and such is the position our learned opponent must sustain, and such is the decision of the court below.

In this case the court will remark, that no part of the capital stock of the association is used in the traffic with Parker & Co., or in the transaction with Mr. Willoughby, but *new stock* is created by a stroke of the pen, and is the sole consideration for the title of the Mecanics' Banking Association to the stock of Maine or to the bond and mortgage of Willoughby.

What is the value of this new stock? What limit shall there be to its creation? If legalized what can hinder an association with the minimum capital of $100,000 becoming the owners of all the stocks in Wall street, and paying for them by this creation of a new and visionary capital?

The court below, when pressed by these and similar considerations, legalized the transaction upon a very novel and extraordinary, and rather unintelligible hypothesis, viz: that the transaction by which the stock was procured was valid, if it was so procured by the association, *either for the purpose of depositing, or of immediately procuring the bond and mortgage of Mr. Willoughby for the purpose of being so deposited.*

It is very probable that the jury found as the facts seem to have been, that the stock of Maine was purchased with the new and unauthorized stock of the Mechancics' Banking

36

Association, "for the purpose of *immediately* procuring the bond and mortgage of Mr. Willoughby, to be deposited", &c. Where did the learned judge find this extraordinary proposition ? What section of the statute sanctioned it ? By what consideration of policy, consistent with the general features of this law, is it sustained ? What value is there in the simultaneous character of the transaction?

It appears to me that if the case required any aid beyond the suggestion already made, it receives it fully from the very consideration above expressed, the effect of which is to make the transaction, as it was, one entire and immediate transaction, and consequently illegal and unauthorized in all its parts.

With regard to these banking associations, the general impression has been that those who associate in this function and bring in the needful capital, take care at the outset to have their assets in such form as may best suit their views—if they intend to bank with circulating notes, some of the association will take care to possess themselves of public or state stocks, or mortgages, and be then in a condition to deposit immediately upon the creation of the association; and this we insist is the correct and only feasible course. These associations, immediately on their creation, fall under the provision of the general statute governing moneyed corporations (1 R., S. 588), and are either by its language or spirit expressly prohibited from trafficking in stock, and would seem to be denied the power of purchasing them, even by an exchange of the original stock. And the intention to deposit them with the comptroller as the basis of issues could not create the right.

All supposed difficulties and incongruities existing, or supposed to exist on this head, are solved by the suggestion that the law presumed the existence of stocks and mortgages as part of the property of the bank at its creation.

It is not necessary, however, to discuss this point, and it is here adverted to merely for the purpose of strengthening the position already taken, it being quite clear that if such traffic would not be tolerated when the "stock properly" having a *real value* was made the basis of exchange, much

Comstock v. Willoughby.

less could it be tolerated when a fictitious stock *unauthorized* by law, and utterly valueless, was so used.

On this branch of the case, therefore, thus summarily opened, and which embraces the first ten points above stated, we insist that this must be treated as one entire transaction; and that consequently the following positions are the necessary result:

1. That the bond in question, being one of the securities thus taken in the course of this illegal proceeding, is utterly void, on the principle of the cases above cited.
2. That if the bond can by any reasoning be sustained as a valid security, to the extent of the value of the Maine stock, it is clearly void for failure of consideration to the extent of the $10,000 of new stock embraced in it.

On the question of Usury, which is next to be considered, should this court deem this to be a valid bond to any extent, the features of this case are in the main quite similar to those disclosed in the case of *Seymour* v. *Strong*, 4 Hill, 255, and the same disposition ought to have been made of it.

In that case a loan under a device of a sale being plainly the subject of negotiation, the borrower agrees to assign to the bank of Rochester bonds and mortgages on real estate to the amount of $13,000, payable in five years, with interest semi-annually, undertaking at the same time to guarantee the payment of the mortgages. In return the bank agreed to give $6,500 in cash, and to transfer to him 130 shares of the stock of the Rochester cotton manufacturing company, the nominal value of which was $6,500, but which at that time was depressed in the market.

This transaction, like the one under consideration, was in writing, and might have been from the terms used, either a sale or a device to cover a loan. The judge who presided at the trial of the cause, left it to the jury (as the judge did in the case under consideration) to say which it was, and the jury, disregarding as they are apt to do the statute of usury, pronounced it a very honest sale.

This court, upon an application, granted a new trial, and

upon that occasion used the following language which seems perfectly applicable to and decisive of the present case.

"The various agreements, notes and other arrangements were all part of one transaction, and the effect of them was to secure more than 7 per cent per annum to the bank for the loan. The whole was *radically* and *necessarily* vicious, and there was *no question for* the jury.

We insist, that a similar course ought to have been pursued here, and, to enable the court so to do, various calcula tions were in the course of argument presented, showing usury in various contingencies arising out of the peculiar feature of the bond, viz : the right to call in the principal before the expiration of 10 years, and the reservation of interest at 5 per cent on the Maine stock loan. The judge, however, here also prefered casting the responsibility on the jury, and instead of deciding the matter of usury, or at least interpreting for them the written documents, left the whole matter to them with the direction "that it was not covertly a loan, but really a purchase of the stock, and was not a design or shift to evade the appearance of its being a loan, when it was really and in fact a loan, then the bond was not usurious."

But in the next place, if the court should on examination find any thing varying the present case from the case of *Seymour* v. *Strong*, and relieving the court below from the duty of deciding on the matter itself as "radically and ne cessarily vicious," we then insist that it was at least their duty to have interpreted for them the written documents, and to have disembarrassed their minds of the leading question whether this was a sale or a loan, as this court has clearly directed in the case of *Steele* v. *Whipple*, 21 Wend., 105.

In that case, the question of usury arose upon parol and undisputed evidence, and its effect was resisted by the plain tiff, who insisted that he was a bona fide endorser. The judge submitted it to the jury to say—

1. Whether there was usury in the note.
2. If there was, whether the plaintiff was a bona fide holder.

The jury having found for the plaintiff, this court ordered a new trial and ruled that the minds of the jury should have been *disembarrassed of the first question,* by being told that the note was clearly usurious.

The jury in the case under consideration became also completely entangled in form, by the very censurable negative pregnant character of the charge. A charge naturally inviting them to a result the responsibility of which the court would not take upon itself, as it might and ought to have done.

We do not, however, ask the court in this case to go to the length of either of these cited cases, nor to apply the very sensible moral and stringent remark of the dissentient judge in the case of *Ketchum* v. *Barber,* 4 Hill, 231, that there are cases when the transaction is mathematically usurious, and this is one of them, rendering an appeal to the jury worse than idle. But we do insist, that it was the duty of the judge to have informed the jury whether, under the written documents, this transaction was a sale or a loan, and not to have left that question to their decision to the very manifest injury of the rights of the defendant below. If the judge had decided that the written documents (when legally interpreted) showed this transaction to be a *sale,* we have our remedy by an appeal to this honorable court, and if on the contrary he had decided it *was* a loan, a verdict of the jury that there was no usury would have been too clearly erroneous to have given us any serious embarrassment in the court below.

I close this part of the case by drawing the attention of the court to the important written documents there refered to the jury for interpretation:

1. The contract between the bank and Parker & Co.
2. The proposed contract between the bank and Willoughby.
3. The written conditional agreement on the part of the bank.
4. The various entries in the books of the bank, in which the transaction is spoken of throughout as a loan.

How could the jury give the proper legal interpretation to the documents? and what right had the court to devolve upon them such a duty?

We have refrained from discussing the question whether this transaction is usurious or not, deeming that inquiry taken from us by the course pursued by the judge below; upon the whole matter, therefore, which we are now allowed to discuss, it appears to us that it is quite impossible to sustain this verdict without doing infinite mischief, not to our client merely, but to the public, inasmuch as such results would—

1. Give to free banks a power of a most pernicious and destructive character, and would

2. Overthrow all the rules laid down by the court to protect suitors from the caprice of juries on questions of usury.

We therefore trust that the judgment will, on one or all of the grounds assumed, be reversed.

*D. Lord*, for defendant in error.

The points of the plaintiff in error will be considered in connection with the facts appertaining to them respectively. They do not need all to be separately discussed as they resolve themselves into two or three conclusions.

The first ground taken by the plaintiff in error is, that the banking association had no power by a new issue of stock to acquire the bond in question.

Before discussing the law on this or any other point we remark that the bond is on its face valid and legal, importing no violation of law, no usury, no exceeding of statutory or common law capacity in the obligee. If the obligor is to repudiate his bond, he must make out his whole case by proof. (*Archibald* v. *Thomas*, 3 Cow., 284.)

Upon the particular ground of objection now in discussion the obligor, if he relies upon the bond being unlawful from not being sanctioned by the articles of association, is bound to show the articles; for, if by any legal articles of association such a transaction is lawful, the court will not

in the absence of proof by the defendant imply or suppose it to be unlawful.

No articles are produced to show that this bond or the transaction out of which it arose was not permitted. It only remains then to consider whether the issue of stock after the original organization of the association must of necessity, under the law, be illegal under any supposable articles.

The § 20 expressly permits the associations by their articles to provide for an increase of capital and of the number of associates from time to time as they may think proper; here then is express authority for the association to have a provision in their articles for an increase of capital from time to time.

The § 27, subd. 11, requires the half-yearly statements to specify the increase of capital from time to time.

The § 28 provides that none of the original capital shall be withdrawn.

The result of these provisions is that the minimum of capital is fixed by the law, provision is made that this shall not be diminished, and full power is granted allowing of increase.

It not being shown that a new issue of stock is contrary to the articles in fact, and it clearly appearing that the articles may lawfully allow of a new issue of stock by way of increase, the defendant has failed to show that a new issue of stock is illegal on this ground of excess of authority.

It is also proper to observe that it appears in the evidence of Mr. Cornell, the cashier, produced by the defendant himself as a witness, that the stock was not at the time of this transaction fully taken up; for he says (fol. 63) "at the time defendant subscribed and afterwards subscriptions were made by others at par and interest in cash and in bonds and mortgages."

II. It is next contended that the association had no right to acquire the Maine stock; which was acquired at the defendant's request to be immediately turned over to him.

The Maine stock was such public stock as was the proper subject of a deposit with the comptroller. The bargain as

to the stock was conditioned on the defendant's giving his bond and mortgage proper for the comptroller, and to be approved by him to the association, upon the association issuing their own stock to Parker & Co., the holders of the Maine stock. The whole arrangement appears in the documents (fol. 54 to 59).

Was it illegal for the association to acquire Maine stock, which it could deposit under the law? Was it illegal to acquire a bond and mortgage which it could deposit under the law? Was it illegal to issue its own stock in exchange for funds which it could deposit under the law? Was it unlawful to exchange one kind of lawful security which it was competent to take for another which it was equally competent to take?—Where was the illegality in any step of the process? It appears by the very papers constituting the transaction that this was not a dealing in stock; for the bank was to make nothing out of it, not to retain it, not to sell it, but merely to receive it for the benefit of the defendant who was to become a large subscriber to their stock, and whom they were to serve at his own request by a mere formal receipt and transfer of the Maine stock.

The defendants in error conceive that it is impossible to doubt that in these particulars also the bond is free of all illegality or excess of power.

It is fit to observe that no policy of the banking law was in any manner infringed by the transaction in question. By the § 18 the associations are authorized to carry on the business of banking; the previous sections having provided for the issuing of their circulation. That circulation was to be based on a deposit of public stocks or bonds and mortgages; and it was clearly incidental to the business they were authorized to carry on, to procure bonds and mortgages and stocks to deposit; they might be procured as original contributions of capital to the common fund, for which stock would be issued, or they might be purchased by any funds; and the power of thus procuring the basis of a circulation is evidently a power incidental, if not absolutely necessary to carry on their business, and is within the very words of the § 18. If by any accident the trans-

action had been interrupted in any stage of it, it would have been lawful. If Parker had failed to transfer the Maine stock, the banking association and Willoughby would have each retained their respective considerations. If Parker had delivered the Maine stock and received the bank stock, and Willoughby had refused, the association would hold a stock which it had a right to acquire, and hold and use as a fund to deposit for circulating notes. In no event, either of the accomplishment or of the interruption of the transaction, could the banking association have been placed in any unlawful attitude. We therefore submit upon the whole of this branch of the case, that the court below did not err in the first point of their charge which affirmed the legality of the transaction, if it was not usurious.

These remarks appear to us fully to dispose of the first ten points of the plaintiff in error.

III. As to the supposed usury.

The counsel of Mr. Willoughby on this part of the case are driven to contend that although this was not in the actual intention of the parties a loan, nor a device to cloak a loan under the form of a sale, yet the legal intendment of the papers and undisputed facts of the case make it a loan and also make it usurious.

As to the facts: the counsel of Mr. Willoughby are pleased to say, that "Willoughby was anxious to obtain a loan in that (Maine) stock to deposit with the comptroller as the basis of the circulating notes." This is perfectly gratuitous. The letter of Mr. Willoughby which was the basis of the whole transaction, (fol. 55) does not speak one word of a loan of Maine stock. A loan of Maine stock, or in Maine stock, must either mean a loan of such stock to be returned specifically, or a loan of money in the form of Maine stock to be converted at his loss into money. Comyn on Usury, 94, and cases there cited.

Now neither of these was Mr. Willoughby's purpose. He was a man of large wealth. He was projecting a bank, by which to loan to others. He was able to give a bond and mortgage of sixty thousand dollars on unincumbered estate, which bond he knew (and as the event has proved) that the

37

comptroller was willing to accept as the basis of an issue of notes. But knowing that notes, stamped as *secured by real estate*, were not likely to be as current as those stamped as secured by public stock accepted by the comptroller, he saw his advantage in procuring the latter, thereby securing to himself the five per cent income on the Maine stock and the profits of the circulation based on it. Now the idea of specific return of the Maine stock was quite inconsistent with the purpose of a deposit with the comptroller, who must be enpowered to hold and sell.

The idea of a sale of the Maine stock for money is equally contrary to the actual and professed object of Mr. Willoughby. If sold it could not be the basis of his circulation. Besides there is not a syllable of testimony on his part, showing that he took the Maine stock as a loan in any sense. He appears to have deposited it. He does not show that he sold it or sustained any loss by a conversion of it into money.

The counsel of Mr. Willoughby refer to the association's book of mortgages (see fol. 78 to 82), and the entries of October 31, 1838, and January 19, 1839, in which it is called a loan in the stock of the association. This appears by the entry (on fol. 82) of November 6, 1838, cotemporaneous with the transaction, to be for the fifty thousand dollars of stock to Parker, owner of the Maine stock, and the ten thousand dollars to Willoughby himself. And in folio 85, an entry of December 6th, 1839, shows that this bond and mortgage, with others, was accepted by them for the stock of the association.

Now certainly what the committee chose, in the distribution of their own work, among themselves to denominate the transaction does not estop or preclude the association from showing its real nature. All these entries might be proper to go to the jury for their consideration in determining whether the transaction was a loan or sale. To say that they preclude all inquiry, and that, although the written contract between the parties and their acts under it show that it was in fact for every purpose a sale, yet a court must call it a loan for the purpose of pronouncing it void, is quite extravagant.

Then the fact of the price of Maine stock was certainly a question for the jury to determine, and is a vital question to Willoughby in his view of the case ; for it is only by showing that, at the time he took the stock, it was selling at a price so low as to overbalance the rate of interest on his bond being under seven per cent, he could begin with any pretence of usury.

In like manner the value of the stock of the association, parted with by them for the bond in suit, was a question of fact, necessary to be passed upon before Willoughby could begin a case of usury. It appears that the association began in the latter part of August, 1838 (Cornell, fol. 57 for date, fol. 61 time of transfer, fol. 63 time of commencement); they had made no losses ; subscriptions were making at the time at par and interest, in cash and bonds and mortgages (fol. 63), and no sales under par had at this time been made (see fol. 75, Hart's testimony); certainly then no court would be warranted in pronouncing this transaction usurious in law, until at least these facts were settled.

But the counsel of Mr. Willoughby think that the judge even in leaving the question to the jury ought to have charged them, that the various agreements, notes and other arrangements were all parts of one transaction and the effect of them was to secure more than seven per cent per annum to the bank for the loan.

Now this supposes that the evidence undisputedly showed the trasaction to be a loan. It is very hard to assert that the case at bar was in judgment of law a loan and not a sale.

The case of *Seymour* v. *Strong*, 4 Hill, does not in its facts approach to a resemblance of the case at bar, but the language of Judge Cowen (4 Hill, 454) is in terms applicable : "Where there is a dispute about the real character of the transaction, as whether it be a sale instead of a loan or forbearance or device, the question is put to the jury."

The counsel of the plaintiff in error also cites the case of *Steele* v. *Whipple*, 21 Wendell, 105. We dismiss this reference without remark other than that it is an authority, that where upon undisputed facts a transaction is on its face usurious nothing is to be left to the jury. We have already

said that in our judgment it would be a very hardy asser-
tion to say so of the case under discussion.

Now if the case presents the question of fact as capable
of doubt, whether this was a sale or not, then clearly the
charge is correct and the judgment is to be affirmed.

IV. But in a case of such amount the defendants in error
are unwilling to leave it even here. We conceive that the
case upon the evidence is a case without any evidence upon
which the defendant below could go to the jury upon a
question of usury.

If the transaction was a sale and not a loan or device to
cover a loan, then usury can not be predicated of it. Now
consider first the Maine stock as the consideration. It has
already been submitted as above that Mr. Willoughby neither
borrowed the Maine stock to be returned specifically nor
with the intent of turning the same into money by a sale at
a loss. It was therefore neither a loan of stock directly, nor
a loan of money directly or indirectly. And if it was not a
loan then the bond and mortgage of Willoughby founded on
it as a purchase was valid ; and being given to the association
instead of Parker & Co. it is no less valid whatever the asso-
ciation may have given to Parker & Co. for it. We are the pur-
chasers of an obligation given upon good and legal considera-
tion, and our right is good however insufficient the amount
we have given. It also was directly transfered by us. Again,
if the Maine stock to Mr. Willoughby were a usurious con-
sideration, yet if the association at Mr. Willoughby's request
parted with a full equivalent to the amount of the bond and
mortgage, it is respectfully claimed that the latter is valid
in our hands. A usurious borrower may borrow either
money or procure other property to pay a usurious debt,
and his bond for it will be good and he must look for his
redress to recovering back the excess from the usurious
lender. Here Willoughby applies to the association for
stock to apply to the now supposed usurious bargain with
Parker. That stock is intrinsically worth par ; the funds
of the association are not shown to have met with any loss.
Subscriptions were daily made at par and interest, no sales
of the stock under par had been made . Now why, if we at

his request issue to any one, on any consideration however inadequate, sixty thousand dollars worth of our stock, must not he perform his engagement to pay for it. For this reason also we conceive there is no pretence of claiming any usury against the association who have given to Mr. Willoughby, or to his order, sixty thousand dollars worth of stock for the bond in suit.

Nor is there any such inadequacy between the Maine stock and the bond as would constitute usury if it all rested on that. The bond was payable with six per cent interest, the Maine stock with five per cent, both at the same credit. Now if the Maine stock was to be kept by Mr. Willoughby he would lose one per cent per annum, which added to the six per cent interest of his bond does not exceed seven per cent. Mr. Willoughby has attempted to show Maine stock in the market to be worth less than par. But he has not shown that he took it to sell, whereby that loss would accrue. On the contrary he shows positively and directly that he took it not to sell but to keep. He does not show that in fact he ever has sold it, much less that he has sold it at a loss.

But he says that the credit at six per cent is not secured to him as he is liable to be called upon on demand. If this earlier demand could be made by the bank at their pleasure there might be some plausibility in this; but if it is to depend solely on the comptroller upon contingencies which never have happened, we submit that this would not render the bond usurious; if it were the bona fide expectation and intention that the full credit should run out, of course it could not be deemed the intention of the parties that it should be earlier demanded. Now the latter clause in the condition of the bond as to the earlier demand at six and twelve months' notice is applicable to and a qualification of the comptroller's demand, and not an option to the obligees at their pleasure to demand at such notice. This is the spirit of the obligation and is the plain meaning of the condition taken altogether.

There is also another consideration to be taken into view even supposing the money demanded earlier than the common term of credit of the bond and the Maine stock. Mr.

Willoughby took the Maine stock not merely for the five per cent interest which it yielded, but also for the advantage he would make on a circulation of bills to be loaned out by him as a banker, on which he was to receive interest and derive a profit also from the loss of the bills in their circulating. Whatever the Maine stock might be worth to a man obliged to sell to realize money, that was not its value to him. He was a man of wealth, wanting this kind of property for its most profitable use and which may have been and in his judgment it was worth to him more than his bond. *Bank of U. S.* v. *Waggoner*, 9 Peters, 378; *Stewart* v. *Farmers' and M. Bank*, 19 Johns., 506; *Segar* v. *Miller*, 1 Hill, 227.

So too as to the $10,000 of our stock; he did not take it to sell and raise money. He kept it as investment. In March, 1839 (fol. 65), he borrowed money on it, kept it till September, 1840, and then allowed it from motives of his own to be sold.

We therefore conclude that the charge of the court on the subject of usury was not only as favorable as Mr. Willoughby had a right to, but far more so; and that as to him it is clearly unexceptionable.

In conclusion, the defendant in error can not but point to the gross injustice of Mr. Willoughby's pretences. He asks the bank to issue sixty thousand dollars worth of stock and then says it was an excess of power and illegal to do it. He receives the Maine stock and complains that taking that is also illegal. He bargains as a wealthy man for the Maine stock as a means of profitable investment; he receives it, uses it, keeps or sells it, and asks the court to say that he never got a title to it. To countenance his defence is to favor the greatest violation of good faith. He has not the pretence of poverty or oppression. He has not shown the loss of a cent upon the Maine stock, and his loss upon the sale of the stock of the association some years afterwards was the result of his mere determination to be litigious. And although the defendants in error are glad to see that through a sense of shame he directs his counsel to say that he has made many efforts to adjust the matter *honorably*, the defendants are obliged to say there is no evidence of it in the case, nor can

they consider the conduct of a man who is able to pay a just debt and refuses to do so, honorable.

An association of mechanics, they look without envy upon the princely style of Mr. Willoughby's life; but they can not be brought to believe any mode of adjusting a debt honorable which does not contemplate full payment, especially when the fund pledged for such payment is adequate and is withheld for the mere purpose of saving money by not performing the condition of his bond.

*S. Stevens*, in reply.

No time will be spent in answering that part of the argument of the defendant in error, which is based upon the asserted wealth of the plaintiff in error, or the motives imputed to him in resisting the present claim. He has a legal defence to the claim, and by the laws of the land is entitled to the benefit of it. He asks no sympathy, yet he might with propriety lay some claim to the public gratitude for resisting the illegal transactions and usurpations of power of this banking association, transactions, which if they can be sustained, will well entitle these institutions to the appellation of free banks, for they will possess "a most extraordinary degree of freedom."

The facts in this case are few and simple, and present two principal questions for solution.

*First.* Had the Mechanics' Banking Association any authority to make the contract upon which they obtained the bond in question?

*Second.* Was the transaction usurious?

In relation to the first question, the facts are simply these: The Mechanics' Banking Association bought $50,000 of the 5 per cent stock of the state of Maine, in payment for which the association issued and delivered an equal amount of its own stock. The Maine stock thus procured was sold or loaned by the association (and which, is immaterial, so far as it regards this branch of the argument) to the plaintiff in error, and it at the same time issued and delivered to the plaintiff in error $10,000 of its own stock, and took from

him the bond in question, accompanied by a mortgage as collateral security.

This whole transaction, we submit, was entirely unauthorized by, and therefore a violation of, the statute creating these institutions.

Associations under this act can carry on no other business than that authorized by the 18th section of the act. They are strictly confined to the power expressly given them by the statute, and all acts and contracts beyond that are void.

The statute does not authorize them to deal in stocks—to buy and sell stocks. If this transaction is upheld, there is nothing to prevent them from entering the stock market in Wall street and becoming stock jobbers to any extent; and the act under which they are organized, instead of being what its title imports, "An act to authorize the business of banking," will be an act to authorize the business of stock jobbing.

It is no answer to this argument to say that the 2d section, which authorizes these associations to pledge state stocks and bonds and mortgages with the comptroller as security for their circulating medium, necessarily authorizes them to purchase those stocks and mortgages.

If any such authority is given by the 2d section, it is only by implication, and that implication can extend no further than to enable them, in the most simple and direct manner, to purchase only such stocks and mortgages as are necessary for that purpose, with the money paid in for their capital stock. It does not authorize them to *sell* state stocks, or to purchase them for the purpose of exchanging them for bonds and mortgages, or for any other purpose whatever, except to deposit with the comptroller.

Nor is there any power, express or implied, authorizing these associations to traffic in stocks, for the purpose of procuring bonds and mortgages to deposit with the comptroller.

If this banking association wished to obtain Willoughby's bond and mortgage to deposit with the comptroller, what was the necessity of buying this state stock at all—why not

buy the bond and mortgage in the first instance directly, if the whole object was to get a bond and mortgage to deposit with the comptroller—and after they had obtained the Maine stock, why traffic it off for a bond and mortgage? That stock would have answered every purpose to deposite with the comptroller, at its fair value. True, if they wished to make a speculation upon this stock—if they wished to obtain for it more than its fair and real value, it would be necessary to traffic it off for a bond and mortgage.

It might with as much propriety be contended on the part of the defendant in error, that they are authorized to purchase and hold land, for the purpose of giving a mortgage upon it to the comptroller, as to traffick in stocks to procure a mortgage for that purpose.

Nor had the association any authority to issue its own stock, which it exchanged for the Maine stock, or the $10,000 which it issued to the plaintiff in error as a part of the consideration of this bond.

The association was already organized and in business when this new emission of stock was issued. It was for them to show, if such were the fact, that their articles of association authorized this increase of their capital stock.

The argument of the defendant in error, that the onus lay on the plaintiff in error to show that the association was *not* authorized to increase their stock, is a gross fallacy. It is based upon the supposition that the association is to be presumed to have authority to increase its capital stock, whereas it is incumbent on the association to show, affirmatively, authority for every act they attempt to do—no authority will be presumed. The plaintiff in error showed that the defendant in error was a banking association under the act of 1838; that act does not authorize the association, after it is organized, to increase its stock, unless such increase is provided for in its articles of association. The onus was then thrown upon the association to show that such provision was made in its articles of association. It is strictly confined to the authority given it.

But the statute does not authorize these associations to increase their capital stock for the purpose of trafficing it

for other property or funds. A just construction of the 20th section of the act will confer no such power. The object of that section is to authorize the associations to provide, by their articles, for an increase of their banking capital, for the purpose of carrying on more extensively the business authorized by the 18th section, and for that purpose to issue new or additional shares of stock to persons who should subscribe and pay for it and become stockholders and associates in the institution.

It would be a perversion of the statute to say that the association might increase its capital stock by itself becoming the holder of its own stock, to be, trafficed off for other property. Was it intended that these associations might provide by their articles that their president and cashier might issue stock and barter it for a bill of exchange, or put it in market to be sold for the purpose of raising money? Such a construction would make their stock as much a circulating medium as bills of exchange; a currency, certainly, not very desirable. The purchase of the Maine stock by the banking association, and the sale of it to the plaintiff in error, were unauthorized, illegal and void, and the bond therefore is wholly void, whatever view may be taken of the issue of the $10,000 of the stock of the association to the plaintiff in error, as a part of the consideration of the the bond—a bond void in part, in consequence of a part of the consideration thereof being in violation of a statute, is wholly void. Hurlstone on Bonds, 13.

Upon the question of usury, it is unnecessary to say more than has already been said in the opening argument. Upon a bill of exceptions the question is whether the charge upon that branch of the case was correct. Upon the evidence in this case the question whether the transaction was a loan or not, was a question of law.

The evidence is in writing. The agreement entered into between the parties was in writing. In law that agreement, if nothing more appeared, would perhaps be deemed a sale, if the bank had power to sell; but then comes the written entry of the bank (the Mechanics' Banking Association) which states that Willoughby's application to the bank was

for a loan of its stocks; the written agreement between the parties, although purporting to be a sale, is still consistent with its being a loan in performance of the application. Taking the whole together, it was a question of law upon the *construction of these written instruments*, whether the transaction was a sale or loan, and that question should have been decided by the court; instead of that, this question of law was submitted to the jury, and that, too, without any instructions as to the legal effect of these instruments. This was erroneous.

If it were proper to submit this question to the jury at all, they should have been instructed to inquire—

1. Whether the application of Willoughby was for a loan or not, with proper instructions as to the conclusiveness of the entry on the books of the bank upon that question, and if they should come to the conclusion that his application was for a loan, then to inquire whether the agreement, which was finally entered into, was to carry into effect that application, or whether it was an original transaction.

If it was intended by the parties to carry into effect the application for a loan, that then they should find the transaction a loan.

But it seems to me that the whole question should have been decided by the court as a question of law, the court gathering the object and intention of the parties from the written instruments, as in other cases. If I am correct in either of these views, then the charge upon that branch of the case was erroneous, and a new trial should be granted.

If the transaction were a loan, it must be seen at a glance that it was grossly usurious. Test the question with the Maine stock. The then present value of the Maine bonds, bearing 5 per cent interest, did not exceed 95 cents on the dollar, and would be therefore only $47,500; the interest upon that sum for one year at 7 per cent would be $3,325; the amount of the principal and interest at the end of the year would be $50,825. This sum is all that the bank could legally demand for a loan of the $50,000 in Maine bonds for one year.

Willoughby has agreed by his bond to pay the bank for

this loan $50,000, with six per cent interest. The amount to be paid at the end of a year according to the bond (if the loan had been for one year only) would be $53,000, being $2,175 over 7 per cent for one year. The excess would be in that proportion for a longer or shorter period. At the expiration of ten years (the time which this bond has to run) the bank would receive $21,750 usurious interest. This is wholly irrespective of the $10,000 of the stock of the bank which the plaintiff in error was required to receive to make up the $60,000 for which his bond was given, and which was immediately hypothecated to the bank for $9,000 in cash, and which in 1840 the bank sold for about $7,000, being $3,000 less than the amount at which it was put into the bond.

By the Court, BEARDSLEY, J. The defendant, being about to establish a banking institution under the law of 1838, was desirous to obtain state stock to deposit with the comptroller as security for circulating notes to be issued by his bank. For this purpose he made an arrangement with the Mechanics' Banking Association, of which the plaintiff was president, and with Messrs. Parker & Co., by which he agreed to give to said association his bond and mortgage for the stock of the state of Maine, which he desired to procure; the association, at the same time, contracting to issue the like amount of their own stock to Parker & Co. in exchange for the state stock which the latter were to furnish. Parker & Co. accordingly transfered to the association the required fifty thousand dollars of stock of the state of Maine, and received therefor that amount of the stock of the association. This amount of Maine stock was received by the defendant, and the association also issued to him ten thousand dollars of their own stock for which he subscribed, and for these two parcels of stock, amounting together to sixty thousand dollars, the defendant gave the bond and mortgage now in question.

The judge charged the jury that if this was a real purchase of state stock by the defendant, and not a loan in disguise, the bond was free from usury.

Comstock v. Willoughby.

There was nothing in this part of the charge of which the defendant can rightfully complain. He hardly gave a shadow of proof to raise the presumption that this was in any sense a loan ; but had the testimony on that point been of a more decided character in his favor, the instruction would still have been correct in point of law. It submitted to the jury the controlling fact, that is, whether the transaction was really a purchase or a disguised loan, and their verdict has disposed of the question of usury. There was nothing to show a case of usury *per se*; it was apparently a purchase rather than a loan, and the jury have found that it was not a loan in disguise. The objection that the bond was usurious must be held to be without any just foundation.

It is assumed that the association, of which the plaintiff was president, was duly formed and organized, as no objection on that ground was made. Nor is the validity of the act under which the organization took place called into question ; the case will therefore be disposed of without regard to such objections, if they could at the proper time have been interposed with plausibility or even with success.

It can hardly be denied that an institution organized under the general banking act may, for the purpose of transfering the same to the comptroller as security for circulating notes, lawfully acquire title to state stocks and bonds and mortgages. This power may not be confered in express terms, nor can that be necessary ; it is too plainly implied by what is expressly declared, to admit of a serious doubt. Associations under this act are in terms authorized to transfer such stock, and bonds and mortgages, to the comptroller and receive from him circulating notes in return. (Laws of 1838, p. 245, §§ 2 to 14.) Some of these sections expressly refer to the associations as owners of the stock and bonds and mortgages thus transfered, and they all plainly imply such ownership.

Having undoubted power thus to own and use such securities the right to acquire them necessarily exists. They may be purchased by the association with the capital paid in by the shareholders or other funds of the institution, and I see no objection to shareholders making payment for the

stock they receive on subscription in the same manner.   The terms on which these securities should be received in payment for stock, so as to make the same equal to cash, and therefore just between the several associates and shareholders, is material and important amongst themselves, but can not affect the capacity of the association thus to acquire such property, or the validity of a title conveyed upon such consideration and for such purpose.   The power seems to me to be incontestable, and a title thus acquired above all impeachment.

The twentieth section of the act makes it " lawful for any association of persons organized under this act, by their articles of association, to provide for an *increase of their capital and of the number of the associates* from time to time as they may think proper."   These articles may have contained such a provision and thus the new issue of stock to the Messrs. Parker & Co., and the defendant, would have been clearly authorized.   But it is objected in the argument submitted on behalf of the defendant, that although it may be lawful to receive state stock or bonds and mortgages from subscribers for stock in the association, and in payment of such subscriptions, yet, in this case, the association having gone into operation, no power existed to make a new issue of stock to Parker & Co. and the defendant.   At all events that such a power was not to be presumed or taken by intendment, and if the plaintiff relied upon any thing contained in the articles of association to uphold the act, he was bound to give those articles in evidence.   But this objection was not taken on the trial nor any one to that effect.   It was there objected that associations formed under the general banking law had " no power to change their stock for the stock of any other company or state ;" not, as is now objected, that this association, at the time and under the circumstances as they existed, had no power to issue the sixty thousand dollars of stock refered to.   Had this objection been made it might have called for the production of the articles of association, but the ground of objection which was stated, so far from creating a necessity for their production, virtually conceded that the association was fully authorized to issue

such new stock. The objection was to the manner of disposing of its stock; a want of "power to change their stock for the stock of any other company or state," and not a want of authority to issue it. The objection now taken, as it seems to me, comes too late and should be disregarded.

What then is this case? An association is formed under the "act to authorize the business of banking," the association providing by their articles, as we must assume, "for an increase of their capital and of the number of the associates, from time to time." Under this authority, after they had gone into operation, the association issued fifty thousand dollars of new stock to Parker & Co., who subscribed for the same, and received in payment therefor the same amount of the stock of the state of Maine. This is the form which that part of the transaction assumed, but in substance, the association, being desirous to obtain the defendant's bond and mortgage to deposit with the comptroller, issued sixty thousand dollars of new stock of which the defendant received as a subscriber ten thousand dollars, and Parker & Co. subscribed for and received the remaining fifty thousand dollars, the same being delivered to them by the direction and for the benefit of the defendant. This is the advance which the association made, in return for which they received the defendant's bond and mortgage for sixty thousand dollars, and he received the fifty thousand dollars of stock of the state of Maine, which the Messrs. Parker & Co. advanced. I see nothing illegal in this transaction, nothing against the terms or the policy of the general banking act. The charge, in my opinion, was correct, and the judgment should be affirmed.

Judgment affirmed.